### IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **VILLAGE OF NYACK, NEW YORK,**<br><br>          Plaintiff,<br><br>      *v.*<br><br>**PROFESSIONAL DISPOSABLES INC.;<br>MIELE SANITATION CO. NY INC.;<br>JOSEPH MIELE;  SAFETY-KLEEN<br>SYSTEMS, INC.;  CLEAN HARBORS<br>ENVIRONMENTAL SERVICES, INC.;<br>UNITED STRUCTURAL WORKS, INC.;<br>TEVA PHARMACEUTICALS USA, INC.;<br>INTERCOS AMERICA, INC.;<br>CEROVENE INC.;  CHARTWELL STAR<br>RX, LLC;  TILCON NEW YORK INC.;<br>PLASTIC-CRAFT PRODUCTS CORP.;<br>GENERAL BEARING CORPORATION;**<br>*and* **M ZONE PROPERTY LLC,**<br><br>         Defendants. | **C.A. No. 7:25-cv-01409**<br><br><br><br>**FIRST AMENDED<br>CERCLA COMPLAINT<br>42 U.S.C. §§ 9607(a) and 9613(f)(1)** |

### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, The Village of Nyack, New York (hereinafter "Plaintiff"), and for its Complaint against the Defendants PROFESSIONAL DISPOSABLES INC.; MIELE SANITATION CO. NY INC.; JOSEPH MIELE; SAFETY-KLEEN SYSTEMS, INC.; CLEAN HARBORS ENVIRONMENTAL SERVICES, INC.; UNITED STRUCTURAL WORKS, INC.; TEVA PHARMACEUTICALS USA, INC.; INTERCOS AMERICA, INC.; CEROVENE INC.; CHARTWELL STAR RX, LLC; TILCON NEW YORK INC.; PLASTIC-CRAFT PRODUCTS CORP.; GENERAL BEARING CORPORATION; and M ZONE PROPERTY LLC (hereinafter, collectively, "Defendants"), avers and states as follows:

## THE PARTIES

**Plaintiff**

1.      **Plaintiff**, the **Village of Nyack** ("Nyack"), is a New York political subdivision with its principal place of business at 9 North Broadway, Nyack Village Hall, Nyack, New York 10960. Plaintiff manages, operates, and controls Nyack's water supply system, including maintenance and improvements of the water treatment plant.

2.       At all relevant times herein, Plaintiff owned and operated and is charged with the responsibility of delivering safe, reliable, and high-quality water that meets state and federal standards to residents and businesses of Nyack, Village of South Nyack, and portions of the unincorporated Clarkstown communities of Central Nyack and West Nyack.

3.      At all relevant times herein, the sole source of water utilized by Plaintiff to provide water to its residents and businesses is one water intake located in the Hackensack River, approximately one mile south of Lake Deforest Reservoir ("Plaintiff's Water Source").

**Defendants**

4.      **Defendant Professional Disposables Inc.** ("PDI") is a New York Corporation with its principal place of business located in New York. It is subject to service of process via its agent, Robert P. Julius, 2 Nice-Pak Park, Orangeburg, NY 10962.

5.       Upon information and belief and at all relevant times herein, PDI is and has been a producer of wet wipes and other materials.

6.      Upon information and belief and at all relevant times herein, PDI operates a facility at 100 Brook Hill Drive (also known as 9 Centerock Road), West Nyack, NY and at 2 Nice-Pak Park, Orangeburg, NY (the "PDI Facilities"), where it distributes and manufactures wet wipes, among other products.

7.     Upon information and belief, the PDI Facilities utilized materials containing per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid (PFOA) and/or perfluorooctanesulfonic acid (PFOS) to enhance the ability to spread cleaning agents or lotions on the skin or surfaces, waterproofing for cleaning and industrial uses, and to add resistance to grease and stains to its products.  Short chain PFAS such as perfluorohexanoic acid (PFHxA) are also used in wet wipes.

8.     Upon information and belief, the PDI Facilities are located within the source water protection area for Plaintiff's Water Source and PFAS released from them migrated to the Hackensack River and to Plaintiff's Water Source.

9.     **Defendant Miele Sanitation Co. NY Inc.** ("Miele Sanitation") is a New York Corporation organized and existing under the laws of the State of New York, having its principal place of business located at 50a Snake Hill Road, West Nyack, NY 10994.  It is subject to service of process via its agent, Joseph Miele, 639 Piermont Road, Closter, NJ 07624.

10.     Upon information and belief, Miele Sanitation operates, or operated, a waste transfer station located at 50a Snake Hill Road, West Nyack, NY (the "Miele Facility").

11.     Upon information and belief, Miele Sanitation has a documented history of environmental compliance issues, including improper transportation and disposal of solid waste, transporting waste to unauthorized facilities, and mixing garbage and recyclables.  Miele Sanitation also has numerous reported spills of petroleum products and liquid chemicals and has received numerous Notices of Violation for its aboveground storage tanks storing waste oils and fuel oils.

12.     Upon information and belief, many types of PFAS are typically present at waste transfer stations, including PFOA and PFOS from nonstick cookware and stain-resistant coatings

and rugs; perfluorobutanesulfonic acid (PFBS) used in water-repellent and non-stick products; and PFHxA found in textiles, paper, and packaging.  The sources of these PFAS are consumer waste, construction debris, and industrial waste.

13.    Upon information and belief, the Miele Facility is located within the source water protection area for Plaintiff's Water Source and PFAS released from it migrated to the Hackensack River and to Plaintiff's Water Source.

14.    **Defendant Joseph Miele** is a natural person who resides in the State of New Jersey at 639 Piermont Road, Closter, NJ 07624.  He is subject to service of process at 639 Piermont Road, Closter, NJ 07624.

15.    Upon information and belief, Joseph Miele was the owner of the property on which Meile Sanitation operates.

16.    **Defendant M Zone Property LLC** is a New York Limited Liability Company organized and existing under the laws of the State of New York, having its principal place of business located in New York.  It is subject to service of process via its agent, Anthony Teplitz, 108 West Nyack Road, Nanuet, NY 10954.

17.    Upon information and belief, M Zone Property LLC is the current owner of the property on which Miele Sanitation operates.

18.    **Defendant Safety-Kleen Systems, Inc.** ("Safety Kleen") is a Wisconsin Corporation registered to do business in the State of New York.  It is subject to service of process via its agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington, DE 19801.

19.    Upon information and belief, Safety-Kleen performs, and has performed, a variety of waste disposal and cleaning services for industrial and commercial clients including collecting

and refining used oil; collecting used solvents; washing machine parts; vacuum removal of hazardous and non-hazardous waste; waste management solutions; environmental compliance services; and emergency response.

20.    Upon information and belief, Safety-Kleen handles materials contaminated with PFAS, including PFOS, PFOA, and PFHxS, among other types of PFAS.

21.    Upon information and belief Safety-Kleen operates a facility at 50 Snake Hill Road, West Nyack, New York (the "Safety-Kleen West Nyack Facility").

22.    Upon information and belief from approximately 1970 to 1995, Safety-Kleen operated a storage facility located at 68 North Harrison Avenue, Congers, New York ("Safety-Kleen Congers Facility").

23.    Upon information and belief, Safety-Kleen performed a corrective action cleanup under the Resource Conservation and Recovery Act ("RCRA") at its Safety-Kleen Congers Facility due to groundwater and soil contamination, with oversight by the New York State Department of Environmental Conservation, and a remedial system was in operation from December 1995 through March 1998.

24.    Upon information and belief, Safety-Kleen transferred operations from the Safety-Kleen Congers Facility to the Safety-Kleen West Nyack Facility, following decommissioning of the Safety-Kleen Congers Facility.

25.    Upon information and belief, both the Safety-Kleen West Nyack Facility and the Safety-Kleen Congers Facility are and were, respectively, located within the source water protection area for Plaintiff's Water Source and PFAS released from them migrated to the Hackensack River and to Plaintiff's Water Source.

5

26.     **Defendant Clean Harbors Environmental Services, Inc.** ("Clean Harbors") is a Massachusetts Corporation registered to do business in the State of New York.  It is subject to service of process via its agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington, DE 19801.

27.     Upon information and belief, Clean Harbors acquired Safety-Kleen in a 2012 stock purchase, taking control of Safety-Kleen and acquired its assets, operations, and liabilities.

28.     **Defendant General Bearing Corporation** ("General Bearing") is a Delaware Corporation registered to do business in the State of New York.  It is subject to service of process via its agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

29.     Upon information and belief, General Bearing is and has been a manufacturer and distributor a variety of bearing components, including ball bearings and tapered roller bearings, at its facility located at 44 High Street, West Nyack, New York (the "General Bearing Facility").

30.     Upon information and belief, PFAS were and are used commonly throughout the bearing industry for their water, heat, and dirt resistance, which add to the self-lubricating properties of bearings.  PFAS coatings on roller bearings improve durability and reduce friction in high stress environments.

31.     Upon information and belief, General Bearing used PFAS at its General Bearing Facility.

32.     Upon information and belief, the General Bearing Facility is located within the source water protection area for Plaintiff's Water Source and PFAS released from it migrated to the Hackensack River and to Plaintiff's Water Source.

33.     **Defendant United Structural Works, Inc.** ("United Structural") is a New York Corporation with its principal place of business in the State of New York.  It is subject to service of process via its agent Corporation Service Company, 80 State Street, Albany, NY 12207.

34.     Upon information and belief, United Structural operates a 6.5-acre facility located at 45 Hemlock Drive, Congers ("United Structural Facility").

35.     Upon information and belief, United Structural is and has been a steel fabrication and erection company specializing in renovating historical buildings and existing structures and PFAS are used as coatings to enhance durability and water resistance of steel.

36.     Upon information and belief, the United Structural Facility is located within the source water protection area for Plaintiff's Water Source and PFAS released from it migrated to the Hackensack River and to Plaintiff's Water Source.

37.     **Defendant Teva Pharmaceuticals USA, Inc.** ("Teva") is a Delaware Corporation registered to do business in the State of New York.  It is subject to service of process via its agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

38.     Upon information and belief, Teva used to operate a pharmaceutical manufacturing facility located at 77 Brenner Drive, Congers, New York ("Teva Facility") and a facility located at 125 Wells Avenue, Congers, New York.

39.     Upon information and belief, PFAS are and have been widely used in laboratory and manufacturing equipment in the pharmaceutical industry, particularly in non-stick coatings, seals, and gaskets due to their chemical resistance and durability, and in pharmaceutical packaging for their moisture resistance.

40.     Upon information and believe, Teva used PFAS at the Teva Facility.

41.     Upon information and belief, the Teva Facility was located within the source water protection area for Plaintiff's Water Source and PFAS released from it migrated to the Hackensack River and to Plaintiff's Water Source.

42.     **Defendants Intercos America, Inc.** ("Intercos") is a Delaware Corporation registered to do business in the State of New York.  It is subject to service of process via its agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

43.     Upon information and belief, Intercos develops and manufactures cosmetics, skincare, and personal care products for various beauty brands.  Intercos operates a production facility at 200 Route 303 North, Congers, New York ("Intercos Congers Facility") where it develops and manufactures cosmetics, skincare, and personal care products.

44.     Upon information and belief, the Intercos Congers Facility is a small quantity generator of hazardous waste.

45.     Upon information and belief, a December 2014 spill of acid at the Intercos Congers Facility caused the evacuation of 350 people from the facility and resulted in two (2) people going to the hospital.

46.     Upon information and belief, Intercos also operates a facility a 11 Centerock Road, West Nyack, New York (also identified as 110 Brook Hill Drive, West Nyack, New York) (the "Intercos West Nyack Facility").  The Intercos West Nyack Facility focuses on development, production, and packaging of cosmetic products.

47.     Upon information and belief, PFAS have historically been used in the cosmetics and personal care products industry for their unique properties such as water and oil resistance, and their durability; to improve the application of these products; and to create film-forming agents used in cosmetics.  PFAS have been used in mascaras and eyeliners, lipstick and lip balms,

concealers and long-lasting foundations, sunscreens, hair products, and skincare formulations. One study found that more than half of the 231 cosmetic products tested contained high fluorine content, strongly suggesting the presence of PFAS.[1]

48.     Upon information and belief, Intercos has used PFAS at both the Intercos Congers Facility and the Intercos West Nyack Facility.  Both facilities are located within the source water protection area for Plaintiff's Water Source and PFAS released from them have migrated to the Hackensack River and to Plaintiff's Water Source.

49.     **Defendant Chartwell Star Rx, LLC** ("Chartwell") is a New York Limited Liability Company with its principal place of business in the State of New York. It is subject to service of process via its Headquarters at 77 Brenner Drive, Congers, NY 10920.

50.     Upon information and belief, Chartwell is a pharmaceutical company and operates a facility at 77 Brenner Drive, Congers, New York (the "Chartwell Facility").

51.     Upon information and belief, Chartwell specializes in generic pharmaceutical manufacturing and, among other things, manufactures generic drugs, develops formulations, and performs packaging of its products.

52.     Upon information and belief, PFAS are and have been widely used in laboratory and manufacturing equipment in the pharmaceutical industry, particularly in non-stick coatings, seals, and gaskets due to their chemical resistance and durability, and in pharmaceutical packaging for their moisture resistance.  PFAS can also be found in certain drug formulations.

---

[1] *See* Environmental Working Group, *Study: Toxic 'forever chemicals' widespread across many cosmetics categories*, June 15, 2021, https://www.ewg.org/news-insights/news-release/study-toxic-forever-chemicals-widespread-across-many-cosmetics.

53.     Upon information and belief, Chartwell used PFAS at the Chartwell Facility, and this facility is located within the source water protection area for Plaintiff's Water Source and PFAS released from it have migrated to the Hackensack River and to Plaintiff's Water Source.

54.     **Defendant Cerovene Inc.** ("Cerovene") is a Delaware Corporation registered to do business in the State of New York.  It is subject to service of process via its agent, Agents For Delaware Corporations, Inc., c/o Karin R. Slacum, 310 Alder Road, Dover, DE 19904.

55.     Upon information and belief, Cerovene is, and at all times relevant herein has been, a pharmaceutical company and operates a facility at 612 Corporate Way, Suite 10, Valley Cottage, New York (the "Cerovene Facility") where it develops, manufactures, and processes pharmaceutical products.

56.     Upon information and belief, PFAS are widely used in laboratory and manufacturing equipment in the pharmaceutical industry, particularly in non-stick coatings, seals, and gaskets due to their chemical resistance and durability, and in pharmaceutical packaging for their moisture resistance.  PFAS can also be found in certain drug formulations.

57.     Upon information and belief, Cerovene used PFAS at the Cerovene Facility, and this facility is located within the source water protection area for Plaintiff's Water Source and PFAS released from it have migrated to the Hackensack River and to Plaintiff's Water Source.

58.     **Defendant Tilcon New York Inc.** ("Tilcon") is a Delaware Corporation registered to do business in the State of New York.  It is subject to service of process via its agent, The Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808.

59.     Upon information and belief, Tilcon operates facilities at both 66 Scratchup Road, New City, New York and 1 Crusher Road, West Nyack New York (the "Tilcon Facilities") that include quarries, asphalt plants, supply related building materials, and offers road paving services.

60.     Upon information and believe, PFAS are used to enhance the performance of asphalt, including adding properties for durability and water resistance, and are used as lubricants in construction processes, and as lubricants on equipment used to apply asphalt.

61.     Upon information and belief, Tilcon used PFAS at the Tilcon Facilities, both these facilities are located within the source water protection area for Plaintiff's Water Source and PFAS released from them have migrated to the Hackensack River and to Plaintiff's Water Source.

62.     **Defendant Plastic-Craft Products Corp.** ("Plastic-Craft") is a New York Corporation with its principal place of business in the State of New York.  It is subject to service of process via its agent, Mark Brecher, 744 West Nyack Road, West Nyack, NY 10994.

63.     Upon information and belief, Plastic-Craft is a plastic fabrication company that operates a facility at 744 West Nyack Road, West Nyack, New York ("Plastic-Craft Facility").

64.     Upon information and belief, PFAS are customarily used in plastic fabrication, as both primary materials and in the fabrication process for their nonstick, water and oil resistance, and for their durability in lubricants.

65.     Upon information and belief, Plastic-Craft used PFAS at the Plastic-Craft Facility, this facility is located within the source water protection area for Plaintiff's Water Source, and PFAS released from it have migrated to the Hackensack River and to Plaintiff's Water Source.

## FACTUAL BACKGROUND

### A.    PFAS and Their Risk to Public Health

66.     PFAS are man-made manufactured chemical compounds containing fluorine and carbon.  The carbon-fluorine bond is one of the strongest bonds in chemistry and provides PFAS their unique chemical properties.

67.     These synthetic chemicals have been used for decades and found in a wide range of industrial, commercial, and consumer products and activities such as nonstick cookware, industrial waste disposal, the pharmaceutical industry, cosmetics and beauty products, mining, plastic fabrication, and landfills and transfer stations.  The wide range of uses is due to their unique properties, such as their mobility, ability to reduce surface tension and use as lubricants, and resistance to heat, water, and oil.  In addition, their resistance to high temperatures and chemical reactions makes them ideal for chemical processing and manufacturing.  PFAS are also used in chemical manufacturing as surfactants and emulsifiers.

68.     PFAS enter the environment, in part, from industrial and commercial facilities that make or use PFAS to make other products, through effluent runoff from landfills and transfer stations, and waste disposal.

69.     Due to their strong chemical bond, PFAS can remain in the environment, particularly in water, for many, many years and are therefore referred to colloquially as "forever chemicals" and are resistant to degradation due to light, water, and biological processes.

70.     Because of their unique properties PFAS are mobile and persistent in the environment.  PFAS readily contaminates soils and leach from soils into surface and groundwater, where they can travel significant distances.  PFAS therefore spread easily once released into the environment.

71.     Once PFAS enter a water supply they spread rapidly because they are water soluble, with contaminated drinking water reaching every home and a service connection's place of business.

72.     PFAS bioaccumulate, meaning that they tend to accumulate in organisms.  PFAS bioaccumulate in numerous ways.  They are relatively stable once ingested, and bind to proteins

and molecules in blood, tissues, and organs rather than fat like many other persistent chemicals. These properties allow them to stay in the human body for long periods of time, and long-term exposure such as drinking PFAS contaminated water every day can cause significant accumulation even at low levels of exposure. In humans, PFOA and PFOS remain in the body for years. Thus, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present, and only increase health risks over time.

73.     PFAS also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

74.     PFAS are toxic and cause significant adverse effects to human health. Human studies show associations between PFOA and PFOS levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer. In addition, PFOA is associated with high cholesterol, decreases in antibody responses to vaccines, high blood pressure and preeclampsia during pregnancy, and decreased birthweight.

75.     These injuries can arise months or years after exposure to PFAS.

76.     PFAS' extreme persistence in the environment and its toxicity, mobility, and bioaccumulation potential, pose significant adverse effects to human health and the environment.

77.     PFOS, PFOA, perfluoroheptanoic acid (PFHpA), and perfluorohexanoic acid (PFHxA) are among the 29 contaminants now being monitored under the United States Environmental Protection Agency's ("EPA") Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), a rule EPA promulgated under the Safe Drinking Water Act.[2] This rule is part of a

_____

[2] *See* Final Rule, Revisions to the Unregulated Contaminated Monitoring Rule (UCMR 5) for Public Water Systems

federal initiative to collect data on unregulated contaminants in public water systems. The goal is to determine the prevalence and concentration of these contaminants and assess whether future regulation of them is necessary to protect public health.

78.     EPA has concluded that PFOS and PFOA are likely to be carcinogenic to humans, and likely to cause hepatic, immunological, cardiovascular, and developmental effects in humans.

79.     PFHpA is suspected to cause cancer, cause endocrine disruption, accelerated puberty, cause liver and immune system damage, and linked to reduced fertility and low birth rates. Chronic exposure to PFHpA, such as consuming contaminated drinking water over an extended period, poses serious health risks.

80.     Recent research indicates PFHxA can cause kidney and liver toxicity, endocrine and hormonal disruption, developmental and reproductive effects and immune system impacts. Chronic exposure to PFHpA, such as consuming contaminated drinking water over an extended period, poses serious health risks.

81.     On April 10, 2024, EPA announced enforceable levels for PFOA, PFOS, and other PFAS in drinking water.  Specifically, EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt and (also expressed as ng/L) under the Safe Drinking Water Act.[3]

82.     Effective July 9, 2024, EPA designated both PFOS and PFOA as a "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.,* because EPA determined that PFOS and PFOA "may present a substantial danger to the public health or welfare or the environment when released."[4] Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

and Announcement of Public Meetings, 86 Fed. Reg. 73131 (Dec. 27, 2021).

[3] *See* Final Rule, PFAS National Primary Drinking Water Standards, *See* 89 Fed. Reg. 32532 (April 26, 2024).

[4] Final Rule, Designation of Perfluorooctanic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA

B.    <u>**Village of Nyack Public Water Supply**</u>

83.    Plaintiff established the Village of Nyack Water Department, a nonprofit public benefit department, to provide Plaintiff's service area with a safe and abundant supply of water.

84.    Plaintiff draws water from the Hackensack River.  This river flows from Lake Deforest Reservoir, approximately one mile north of Plaintiff's water intake and water treatment plant.  Plaintiff, through the Water Department, serves approximately 15,000 people with 3,300 service connections in Nyack, South Nyack, and portions of the unincorporated Clarkstown communities of Central Nyack and West Nyack.

85.    Plaintiff has elevated levels of PFAS in its drinking water, including PFOS, PFOA, perfluoroheptanoic acid (PFHpA), and perfluorohexanoic acid (PFHxA).  These include the following monitoring results in part per trillion (ppt):

| Sample Date | PFOA | PFOS | PFHpA | PFHxA |
|:---:|:---:|:---:|:---:|:---:|
| 10/13/2020 | 13.0 | 8.1 | 4.4 | 5.1 |
| 8/26/2021 | 7.7 | 4.9 | 3.7 | 4.6 |
| 5/20/2022 | 10.0 | 6.8 | 3.8 | 5.0 |
| 8/11/2023 | 9.1 | 5.4 | 3.5 | 5.3 |

86.    Plaintiff's drinking water contamination levels for PFOS and PFOA are all above EPA's promulgated drinking water standard (the maximum containment level) of 4.0 ppt for these PFAS.

87.    Plaintiff has begun planning and designing a water treatment system to remove PFAS contamination from its water supply in order to protect the health of its residents and consumers, and to comply with State and federal drinking water standards.  The New York State

Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024).

Department of Health ("NYSDOH") has approved initial designs for this project, and Plaintiff is waiting for final approval from NYSDOH before it begins construction.

88.     Plaintiff's damages, caused by the above contamination, include, but are not limited to, investigation costs, testing and monitoring costs, costs of planning, design and installation of water treatment systems, treatment, operating and maintenance costs, infrastructure modifications, engineering fees and other related costs, all to protect its citizens from the harms of PFAS.

89.     Each of the Defendants' facilities are located within the source water protection area for Plaintiff's Water Source, and PFAS released from them migrated to the Hackensack River and to Plaintiff's Water Source.

90.     Defendants, as the responsible parties, and not Plaintiff, their taxpayers, or their customers, should bear all past, present, and future costs of addressing the above contamination and removing PFAS from the water supply.

91.     Upon information and belief, the Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## JURISDICTION AND VENUE

92.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).  Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")).  Pursuant to 28 U.S.C. § 1367(a) the Court has

supplemental jurisdiction of all other claims that form part of the same case or controversy under

Article III of the United States Constitution. Plaintiff brings this civil suit, in part, pursuant to

sections 42 U.S.C. §§ 9607(a) and 9613(g) of CERCLA.

93.      This Court has personal jurisdiction over Defendants by virtue of each Defendant's

regular and systematic contacts with New York, including, among other things, conducting

business and/or owning property in New York, and because they have the requisite minimum

contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over

them consistent with traditional notions of fair play and substantial justice.  *See* N.Y. C.P.L.R. §

302.

94.      Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial

part of the events giving rise to the Plaintiff's claims occurred in this judicial district, and a

substantial part of property that is the subject of this action is situated in this judicial district.

## FIRST CAUSE OF ACTION
### Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)

95.      Plaintiff incorporates by reference the preceding paragraphs as though fully set

forth herein.

96.      Under CERCLA, 42 U.S.C. §§ 9601, *et seq*., owners and operators of facilities are

liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened

release which causes the incurrence of response costs, of a hazardous substance," and other forms

of compensation.  42 U.S.C. § 9607(a).

97.      Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42

U.S.C. § 9601(21).

98.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

99.    Each Defendant is, or was, an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

100.    Each of Defendants' locations identified above is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

101.    PFOA is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

102.    PFOS is  a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

103.    There have been "releases", and/or continue to be releases, and/or disposal of hazardous substances and other PFAS from each Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).  Upon information and belief, these releases or threatened releases are ongoing.

104.    The hazardous substances and PFAS released from Defendants' facilities were, and are being, released within the source water protection area for Plaintiff's Water Source and migrated to Plaintiff's Water Source.

105.    Plaintiff has incurred and will continue to incur necessary response costs pursuant to CERCLA § 107(a), all of which are, and will be, consistent with the national contingency plan, as a result of the release and/or threatened releases of hazardous substances and PFAS from Defendants' facilities.

106.    Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances and PFAS that have contaminated Plaintiff's public drinking water supply.

107.    By reason of the foregoing, Defendants are liable, jointly and severally, for Plaintiff's necessary response costs, and damages regarding PFAS contamination to Plaintiff's public water supply.

## SECOND CAUSE OF ACTION
### Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)

108.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

109.    CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. §§ 9607(a),] the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

110.    By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in Plaintiff's public drinking water supply as referenced herein.

111.    A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

112.    A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

113.    Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's public drinking water supply.

114.    Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances and PFAS.

115.    Plaintiff's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

116.    Plaintiff is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

### THIRD CAUSE OF ACTION
**Continuing Public Nuisance**

117.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

118.    Plaintiff, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

119.    The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

120.    Plaintiff supplied a clean, safe, portable source of water until it was discovered that PFAS contamination had migrated to Plaintiff's water supply.

121.    Defendants by their negligent, reckless, and willful acts have caused the release of PFAS from their facilities that, because their facilities are located within the source water protection area for Plaintiff's Water Source, and PFAS released from them migrated to the Hackensack River and to Plaintiff's Water Source.

122.    By their actions, Defendants have unreasonably and substantially interfered with and/or endangered (i) the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater; (ii) Plaintiff's special status and authority regarding its natural resources; (iii) Plaintiff' ability to protect, conserve, and manage its natural resources; and (iv) the rights of the people of its citizens to enjoy their natural resources from interference by pollution and contamination.

123.    Defendants' conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

124.    The public nuisance caused by the presence of PFAS in Plaintiff' drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had, and will continue to have, a significant impact.

125.    The acts and omissions of Defendants unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Plaintiff, its residents, and business, to a safe source of drinking water of their own choosing, and have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

126.    Defendants knew or, in the exercise of reasonable care should have known, that the release of PFAS into natural resources and Plaintiff's Water Source would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment drinking water relied upon by Plaintiff and the public.

127.    As a direct and proximate result of Defendants' conduct, they have created an ongoing public nuisance, and Plaintiff has incurred substantial damages, and will incur additional damages to remove PFAS from the public water supply so Plaintiff can provide its residents and consumer with clean and healthy water.

128.    The interference with Plaintiff's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendants' actions.

129.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**FOURTH CAUSE OF ACTION**
**Continuing Trespass**

130.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

131.    Plaintiff is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Plaintiff's Water Source and delivering drinking water to their residents and users of it.

132.    Defendants knew, or should have known, that PFAS contamination migrated through stormwater runoff, soils, and surface water contaminating Plaintiff' real property used for collecting, treating, and delivering drinking water and the drinking water itself.

22

133.     Defendants did not and do not have authority, privilege, or permission to trespass upon Plaintiff' property interests.

134.     The acts and omissions of Defendants caused the PFAS contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, and the Hackensack river and its tributaries, contaminating Plaintiff's real property used for collecting, treating, and distributing drinking water, interfering with its property rights, including Plaintiff's right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Plaintiff's property and unlawful interference with Plaintiff's property rights.

135.     As a direct and proximate cause of Defendants' conduct in creating an ongoing trespass against Plaintiff's property, in the form of the ongoing PFAS contamination of Plaintiff's water system, Plaintiff has incurred substantial damages and will incur additional damages to remove PFAS from the public water supply in order to provide their residents and customers with clean and healthy water.

136.     As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined at the time of trial.

**FIFTH CAUSE OF ACTION**
**Punitive Damages**

137.       Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

138.       The conduct of the Defendants, including but not limited to:

a.     issuing no warnings and failing to divulge material information concerning the toxic nature, disposal, discharge and release of hazardous substances, including but not

limited to PFAS and/or PFAS containing products, and other toxic chemicals which had a latent danger of impacting the water sources supplying Plaintiff's drinking water; *and*

b.    knowing of the certainty of long-lasting water contamination, including specifically high risks to aquifers, groundwater from hazardous substances, including but not limited to PFAS containing products and other toxic chemicals, but nevertheless discharging these and causing great harm to Plaintiff – demonstrates an outrageous conscious disregard of Plaintiff and its customers' safety with implied malice and oppression for which punitive and exemplary damages should be imposed.

## SIXTH CAUSE OF ACTION:
### Negligence

139.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

140.    Defendants knew or should have known that PFAS and PFAS-containing products and materials, and other toxic chemicals, create a substantial risk of harm to surface water and to members of the public who consume such surface water.

141.    Defendants knew or should have known that the chemicals containing PFAS and other toxic substances which they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soils and surface waters and therefore, Plaintiff's Water Source.

142.    Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS at and from their facilities and/or properties as to cause severe contamination of surface waters and soils and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

143.    Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of PFAS and other toxic chemicals into the surface waters, soil and groundwater at their properties.

144.    Defendants owed Plaintiff a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFAS and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFAS and other toxic chemicals into the hydrological features and into Plaintiff' Water Source.

145.    Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of PFAS from their facilities and/or properties.

146.    Upon learning of a release of solvents and compounds, including but not limited to PFAS containing products and PFAS and other toxic chemicals, at their facilities and/or properties, Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated Plaintiff's Water Source.

147.    Defendants breached the above duties and failed to prevent the releases of PFAS containing products at their properties.

148.    Defendants also failed to take reasonable, adequate, and sufficient actions to eliminate, correct, or remedy the releases of PFAS and other toxic chemicals after they occurred.

149.    Defendants continue to breach their duties to remediate and prevent ongoing and future releases of PFAS and other toxic chemicals from their properties into Plaintiff's Water Source.

150.    As a result of Defendants' breaches of their duties, Plaintiff has expended and will

be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' contamination for many years into the future.

151.    Defendants' breach of their duties were the direct, sole and proximate cause of Plaintiff's damages.

152.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

### SEVENTH CAUSE OF ACTION:
### Failure To Warn

153.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

154.    Defendants breached their duty to notify and warn Plaintiff of the likelihood of release of hazardous substances, including but not limited to PFAS and other toxic chemicals, at and in the vicinity of Defendants' facilities, and, consequently, in the capture zone of Plaintiff's Water Source.

155.    Upon learning of the release of hazardous substances, including but not limited to PFAS and/or products containing PFAS, and other toxic chemicals at their facilities and/or properties, Defendants owed Plaintiff a duty to timely notify and warn Plaintiff of the releases.

156.    Defendants breached that duty by failing to timely notify and warn Plaintiff of the releases of hazardous substances, including but not limited to PFAS and other toxic chemicals, on and under their properties and, consequently, into Plaintiff's Water Source.

157.    As a result of Defendants' breaches of their duty to warn Plaintiff, Plaintiff was forestalled from undertaking effective and immediate remedial measures, and Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

26

158.    As a direct and proximate result of Defendants' above-described failure to provide warnings, Plaintiff has incurred and will continue to incur the following damages:

a.   Existing contamination of Plaintiff's water supply, which may have been prevented or mitigated if timely warnings were given;

b.   Costs of additional testing and monitoring of the hydrological features and Plaintiff's drinking water well for hazardous substances, including but not limited to PFAS and other toxic chemicals' contamination;

c.   Costs of investigations, risk assessment, and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFAS and other toxic chemicals;

d.   Costs of treatment for hazardous substances, including but not limited to PFAS and other toxic chemicals, including design, installation and operation of remediation systems to remove PFAS to a safe level of non-detect;

e.   Loss of water production capacity;

f.   Diminished consumer confidence in Plaintiff's drinking water;

g.   Potential cost to design and install replacement water sources;

h.   Attorney fees and costs; *and*

i.   Other compensatory damages.

159.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the forgoing claims, Plaintiff request that the Court grants the following relief:[5]

---

[5] Plaintiff expressly disclaims recovery for PFAS contamination from aqueous film-forming foam (AFFF).

1.  Find the Defendants liable for necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances and PFAS that have contaminated Plaintiff's public drinking water supply, and order Defendants to reimburse the Plaintiff for its past, present, and future costs to investigate, monitor, evaluate, and remediate the PFAS that continues to migrate into Plaintiff's public water supply, including the costs of employing outside consultants and testing labs for these tasks.

2.  Issue a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in the Village of Nyack's public drinking water supply.

3.  Award Plaintiff monetary damages for the continuing trespass, continuing public nuisance, negligence, and failure to warn caused by the PFAS contamination of the Plaintiff's public water supply.

4.  Order Defendants to pay for or agree to reimburse the cost of a treatment system(s) to be installed by Plaintiff to remove PFAS from the public water supply.

5.  Award Plaintiff its reasonable attorney fees and legal expenses incurred in evaluating the PFAS contamination and prosecuting these claims.

6.  Award Plaintiff such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims for which a jury trial is available.

Dated:  February 24, 2025                    Respectfully submitted,

                                             */s/ Robert Gitelman*
                                             Robert Gitelman, Esq.
                                             **NAPOLI SHKOLNIK PLLC**
                                             400 Broadhollow Road, Suite 305
                                             Melville NY  11747-4810
                                             Tel. (212) 397-1000
                                             RGitelman@napolilaw.com

                                             Andrew Croner, Esq.
                                                  *(Pro Hac Vice Forthcoming)*
                                             James L. Simpson, Esq.
                                                  *(Admission Application Forthcoming)*
                                             **NAPOLI SHKOLNIK PLLC**
                                             360 Lexington Avenue, Floor 11
                                             New York NY  10017-6502
                                             Tel. (212) 397-1000
                                             ACroner@napolilaw.com
                                             JSimpson@napolilaw.com

                                             Paul J. Napoli, Esq.
                                             **NS PR LAW SERVICES LLC**
                                             1302 Avenida Ponce de León
                                             San Juan PR  00907-3982
                                             Tel. (833) 271-4502
                                             PNapoli@nsprlaw.com

                                             ***Counsel for Plaintiff***